**UNITED STATES of America**

v.

**John WOODS and Julius Cooperman.**

**Cr. No. 65–119.**

United States District Court
W. D. Pennsylvania.

Nov. 1, 1965.

---

Hubert I. Teitelbaum, Pittsburgh, Pa., for defendant John Woods.

Jerome M. Libenson, Pittsburgh, Pa., for defendant Julius Cooperman.

Robert E. Tucker, Asst. U. S. Atty., Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for the Government.

DUMBAULD, District Judge.

On June 15, 1965, both defendants, John Woods and Julius Cooperman, were found guilty by a jury under Counts 5, 7, 10, and 11b of violations of 18 U.S.C. § 1010. At the same time the defendants were found not guilty under Counts 1, 2, 8, 11a, and 12 of the indictment. The original indictment was in twelve counts, but the other counts were withdrawn from the jury pursuant to rulings of the Court.

18 U.S.C. § 1010 reads as follows:

*"Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Housing Administration for insurance,* or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Administration, or the acceptance, release, or substitution of any security on such a loan, advance of credit, *or for the purpose of influencing in any way the action of such Administration, makes, passes, utters, or publishes any statement, knowing the same to be false,* or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, *or willfully overvalues any security, asset, or income,* shall be fined not more than $5,000 or imprisoned not more than two years, or both."* (Italics supplied)

It will be noted that the elements of the offense, which must be proved by the Government beyond a reasonable doubt, include the following: (1) *Defendant's act*: (a) The defendant must make, pass, utter, or publish a statement; which defendant knows to be false. (b) Another act punishable is wilfully overvaluing any security, asset or income. (2) *Defendant's purpose*: Whichever of the foregoing acts is committed, it must be done (a) with the specific intent or purpose of obtaining a loan or advance of credit from a financial institution with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Housing Administration for insurance, (b) or for the purpose of influencing in some way the action of that agency.

Thus for the conviction to stand there must be sufficient evidence to sustain a verdict that each of the defendants made or passed a statement, knowing the same to be false, with the intent or purpose of obtaining a federally insured loan or of influencing the action of the Federal Housing Administration; or wilfully overvalued a security or asset with the same intent. The Court so charged (Tr. 306–310). Mention of the particular counts on which convictions occurred was made by the Court at pages 313–315.

Specifically, in Count 5, relating to the Berta loan, the charge is that the salary

or wages of Berta was inflated or overstated. In Count 7, relating to the Denney loan, the charge is that the date of acquisition of a home was incorrectly stated and that the price was overstated. In Count 10, relating to the Dott loan, the charge is that a copy of the contract was not given to the home owners. In Count 11b, relating to the Kuhns loan, the charge is inflation or overstatement of salary.

With regard to Count 5, Berta testified (Tr. 118) that his wages were $350.00 a month, and they were stated on the printed application (Exhibit 11A) as $550.00. Both Cooperman and Woods signed this application as salesmen. Berta testified (Tr. 115) that both men came to the house.

There is, therefore, sufficient evidence against both defendants to sustain the conviction under Count 5.

Under Count 7, Denney testified (Tr. 189) that he bought his home in 1960 for $9100.00, whereas on the credit application Exhibit 14b the date is given as 1956 and the price $15,000.00. This application is signed by Cooperman alone as salesman.

In this connection it may be noted that the application shows a mortgage debt outstanding of $11,500.00, so that a value of only $9100.00 might not have looked good.

On cross-examination Denney testified that actually he had not received a deed to the home but it was being purchased on Articles of Agreement (Tr. 201). Defendants strenuously contend that by reason of this fact it is not a false statement to give the date of purchase and price paid incorrectly, inasmuch as in fact there was no purchase and there was no purchase price. However, the form for the credit application in the line below the one filled in contains a line reading "Is being bought on contract by" with a blank for price paid. Consequently, strictly speaking, it would be a false statement to fill in the blanks which were filled in rather than those on the line below, in view of the facts.

The date of purchase (in view of inflation) and the price paid are both significant data in connection with any determination of the value of the asset (residence property) involved. Did the defendants "wilfully overvalue" this asset? The jury's verdict would have to be taken as conclusive on the issue of wilfulness. Was there overvaluation by them?

Strictly speaking defendants did not place any valuation on this asset. They simply made or passed false statements regarding matters relevant to valuation and from which an inference as to valuation could be drawn by the lending institution or the F.H.A.

But the offense charged in Count 7 is not wilful overvaluation of an asset. If it were, defendants might be entitled to prevail as to this count. What is charged is making false statements. This charge is established by the proof.

There is, therefore, sufficient evidence to establish the conviction of defendant Cooperman under Count 7. Inasmuch as defendant Woods signed the completion certificate on this transaction, and also wrote to the home owners sending them an additional copy of the contract and is shown by testimony to have participated in the transaction (Tr. 180, 191, 213), we believe that the jury could reasonably have found that defendant Woods was a knowing participant in all aspects of the transaction, even though he did not sign the certificate as salesman.

Under Count 10 both Mrs. Dott and Mr. Dott testified that they at no time ever received a copy of the contract (Tr. 256, 275). It is the Court's recollection that both of these witnesses appeared more intelligent than the other home owners involved in dealings with the defendants. The jury might well have placed credence in their testimony rather than that of defendants. Defendants, of course, contend that they routinely furnished a copy of the contract to all their customers, but this is a jury question. The testimony indicates that both defendants negotiated this transaction

(Tr. 255, 261). In particular, defendant Cooperman was implicated (Tr. 258, 260, 263–264).

There is thus sufficient evidence to sustain the conviction of both defendants under Count 10.

Under Count 11b, Exhibit 22b, signed by Cooperman alone, states the home owner's salary as $575.00 per month. He testified that his yearly earnings were $5,376.75. Mathematically this amounts to $464.72 per month. He was employed at an hourly rate. It is the Court's recollection that this witness made a favorable impression on the witness stand, and might well have been believed by the jury, in spite of some confusion arising during cross-examination.

The testimony shows that both defendants were present when the home owners signed the papers and when information was given to the defendants regarding the matters to be used in filling out the forms (Tr. 215–216, 218, 221, 226).

We, therefore, conclude that there is sufficient evidence against both defendants to sustain a conviction under Count 11b.

Cooperman testified that Woods filled in the Berta credit application (D.Tr. 28). Cooperman testified that he himself filled in the Denney application, by using a figure taken from the appraisal of the bank that made the consolidation of debts loan (D.Tr. 30, 32, 50).

Cooperman testified that he signed the credit application in the Dott case, but Woods signed Exhibit 3, the completion certificate (D.Tr. 52).

In the Kuhns transaction Exhibit 22B was signed by both defendants (D.Tr. 54–55). Woods filled it out but Cooperman was there (D.Tr. 16, 41, 45). Cooperman testified that all the forms that were signed by him were filled in by him. (D.Tr. 21). Woods testified that both defendants were present when all the contracts were signed (D.Tr. 69). Woods testified that the contract and the credit applications were sent to the bank before completion of the work in every case (D.Tr. 77).

It is ingeniously argued on behalf of the defendants (Brief p. 5) that the proof does not show that the false documents were passed with the necessary intent of obtaining an F.H.A. loan or influencing the action of the F.H.A. It is argued that the testimony of the witness Barry from the Mellon bank shows that the bank actually relied on telephone calls from defendants' office in issuing commitments, and that the written applications were mere formalities which were checked only for completeness and not for the reliability of their content.

However, as defendant Woods testified (D.Tr. 77) the documents were uniformly transmitted to the bank before defendants did the jobs. It seems clear that without the physical presence of the necessary documents the bank would not disburse a loan even though as a practical matter it would make a commitment in reliance on telephoned information, supplemented by such credit checks as it might wish to make. There is no doubt that everyone knew that what was involved in these transactions was F.H.A. loans (that is, at least the banks and the defendants knew, although many of the home owners testified that they did not know that they were making F.H.A. loans).

Furthermore, Paragraph 201.5 of the F.H.A. Regulations contemplates issuance of commitments by banks only after they receive the credit application. Hence it would seem that, if a lending institution chooses to make a premature commitment at its own risk, the prescribed routine would not be thus disrupted to the extent that parties furnishing false statements in credit applications or other documents required by the Government and in fact subsequently supplied could convincingly contend that these documents were not furnished for the purpose and with the intent of effecting an F.H.A. improvement loan.

■ There is likewise no merit in defendants' contention that the procedure followed in selection of the jury was inadequate.

The jury was selected in strict accordance with Criminal Rule 24(a). It also complied fully with all suggestions contained in dicta of the Court of Appeals in Stirone v. United States, 341 F.2d 253, 256 (C.A. 3, 1965). Cf. United States v. Sigal, 341 F.2d 837, 840, 847 (C.A. 3, 1965) and Haith v. United States, 342 F.2d 158, 159 (C.A. 3, 1965).

The trial judge was present at all times during the voir dire and permitted all questions desired by counsel to be asked. The Court *sua sponte* suggested that a pertinent question in this case would be whether the jurors had had any dealings with the F.H.A. (Tr. 6, 27). This question was asked, of a group of jurors including Helen Wagner, No. 126 on the list (Tr. 10, 13). The question was repeated in simpler language by Mr. Teitelbaum (Tr. 22), and five jurors stated they had had F.H.A. loans: Margaret Hornyak, Hyman Weisman, Thomas Zolbe, Margaret Giansante, and Jean Elaine Gaydeski (Tr. 22–24). Of these, Zolbe was discharged for cause, on the ground that his brother was with the F.B.I. Weisman was removed on the Government's second challenge. Hornyak was eliminated by Mr. Teitelbaum on his third challenge. Gaydeski was struck by Mr. Libenson, counsel for Cooperman, on his fifth challenge, and Giansante on his seventh.

It thus appears that counsel for defendants did not consider the circumstance of a juror having had an F.H.A. loan to be of much importance. (See comments of Mr. Teitelbaum at Tr. 27).

We therefore do not attach much weight to the subsequently filed undated affidavit of a Mellon Bank assistant manager to the effect that Helen Wagner and her husband "have an FHA Title I Home Improvement Loan #58018, dated September 2, 1964, for twenty four (24) payments at $13.76 a month", the balance on September 15, 1965 being $123.84 for furnace installation.

It is to be noted that counsel do not say when they obtained this information, or whether they had it at the trial, or whether if they had had it then it would have made any difference in their handling of the case. We cannot believe that it would have been of any significance in view of what has been set forth above.

In view of the small amount involved and the fact that defendants make no charge of any actual irregularity against Mrs. Wagner, it would seem that her failure to disclose this small loan was doubtless due to inadvertence, lapse of memory, or unfamiliarity with business details perhaps handled by her husband. It seems impossible that it can have affected in any way the outcome of the case or the fairness of the proceedings in this Court.

For the foregoing reasons defendant's motions are denied.